SULLIVAN, Presiding Justice,
for the Court:
¶ 1. This case involves a contest for custody of two minor children, a girl, born March 2, 1984, and a boy, born August 31, 1989, between the maternal grandparents (“F.W.K. and L.S.K.”) and the natural father (“S.C.R.”) following the death of the natural mother (“E.K.R.”). At the time of her death, E.K.R. was involved in divorce proceedings with S.C.R., and she and the minor children were residing with F.W.K. and L.S.K.. The trial court awarded custody of the minor children to F.W.K. and L.S.K. and granted visitation rights to S.C.R. Aggrieved by this decision, S.C.R. appeals raising the following issues for this Court’s review:
(1) Whether the trial court erred in granting custody of the minor children to the maternal grandparents F.W.K. and L.S.K. and not the children’s natural father S.C.R.;
(2) Whether the trial court erred in reopening the record after taking the case under advisement over seven months earlier;
(3) Whether the trial court erred in not rendering a decision upon the parties’ respective petitions for custody of the minor children for more than four and one half years following such litigation first being brought before the court;
(4) Whether the trial court erred in awarding judgment against the natural father, requiring him to pay on-half of the remaining unpaid balances of expert witnesses John Pat Galloway, Ph.D. and William S. Wiedorn, M.D., in the amount of $150.00 and $2,425.00 respectively;
(5) Whether the trial court erred in awarding judgment against S.C.R., requiring him to pay all of the fees and expenses of the Guardian Ad Litem, Byron J. Stockstill, Esquire, in the sum of $4, 439.00.
Finding no error, we affirm the judgment of the Pearl River County Chancery Court.

*695
STATEMENT OF THE CASE

¶ 2. F.W.K. and L.S.K. initiated the instant proceedings in the Pearl River County Chancery Court through the filing of a Petition for Termination of Parental Rights and Other Relief on May 25, 1993. In the petition, F.W.K. and L.S.K. sought temporary custody of the minor children and termination of the parental rights of S.C.R., or in the alternative, appointment as guardians over the minor children. S.C.R. filed his Answer and Cross-Petition for Custody on June 4,1993.
¶ 3. On June 9, 1993, the trial court consolidated the divorce action with the instant proceedings. Pending trial, the court awarded temporary custody of the children to F.W.K. and L.S.K. subject to S.C.R.’s visitation rights. The trial court appointed Byron Stockstill as guardian ad litem for the children. After several continuances and evaluation by multiple experts, an evidentiary hearing was held on April 2 and 3, 1996. At the conclusion of the hearing, the trial court sustained S.C.R.’s Motion to Dismiss the Petition to Terminate his Parental Rights and took the case under advisement for rendition of judgment thereafter.
¶ 4. On September 9, 1996, F.W.K. and L.S.K. filed their Motion to Reopen Record of the instant proceedings based on allegations of abuse concerning one of the minor children purported to have occurred subsequent to the April 1996, hearing. The court sustained the motion to reopen the record and ordered that an evidentiary hearing be held as soon as possible with respect to the allegations of abuse.
¶ 5. The trial court conducted a second evidentiary hearing on August 13 and 14, 1997, limited to evidence arising after the original hearing on the merits. On October 14, 1997, the trial court entered its Memorandum Opinion awarding F.W.K. and L.S.K. legal custody and guardianship of the two minor children subject to the visitation rights of S.C.R. The trial court taxed S.C.R. with the costs of court-appointed expert Pamela D. Cutrer, Ph.D., one half of the remaining balances due to the court-appointed experts John Pat Galloway, Ph.D. and William S. Wiedorn, M.D., and all the costs of the guardian ad litem.
¶ 6. The court’s Memorandum Opinion was incorporated into its Judgment entered on December 1, 1997, to which S.C.R. filed his Motion to Alter or Amend Judgment, or in the Alternative for a New Trial on December 11, 1997. The trial court overruled S.C.R.’s Motion to Alter or Amend Judgment, or in the Alternative for a New Trial through its order entered on December 18, 1997. On January 20, 1998, S.C.R. timely filed his Notice of Appeal to this Court.

STATEMENT OF THE FACTS

Testimony — First Hearing
¶ 7. S.C.R. and E.K.R. had two children, a girl, born March 2, 1984, and a boy, born August 31, 1989. The couple separated on March 12, 1992, and were involved in divorce proceedings when E.K.R. was tragically killed in an automobile collision which occurred on May 19, 1993. At the time of her death, E.K.R. and the two minor children were residing with her parents, F.W.K. and L.S.K.
¶ 8. At the first hearing in April 1996, F.W.K. was sixty-seven years old and L.S.K. was sixty years old. F.W.K. and L.S.K. had been married forty-one years and raised four children. Both F.W.K. and L.S.K. expressed a desire to have custody of the two minor children but stated they were not necessarily eager to be parents and would prefer to assume the role of grandparents. According to F.W.K., the day he told the children about their mother’s .death, the children asked him to keep them from their father.
¶ 9. The older child, then twelve years old, expressed a preference to live with F.W.K. and L.S.K. She testified that on the day her mother died, she asked her grandparents to not let her daddy “get” *696 her. She explained she was afraid of her father because he had mistreated her mother in the past. She related several incidents of spousal abuse which she had witnessed. She also related two incidents when her father hit her because she tried to stop him from hitting her mother. Additionally, she reported several incidents which occurred since her mother’s death including S.C.R. calling her a “bitch,” slapping her and jerking her thumb. She explained visitation was “okay” at first, but then S.C.R. called her a “bitch” and referred to L.S.K. as a “whore” when she asked him why he had treated her mother “like that.”
¶ 10. The younger child, then six years old, testified he enjoys visiting his father and doing things with him. He recalled no abuse at the hands of his father. When asked if he wanted to live with his father, the younger child nodded his head. The court-appointed expert, William Wiedorn, M.D., noted that at this young age, the child most likely was not thinking in terms of custody but was simply expressing a desire to spend more time with his father.
¶ 11. Members of S.C.R.’s family, including his wife, his sister, and his mother, testified about his relationships with the children. S.C.R.’s wife, then twenty-four years of age, stated she and S.C.R. were married a month an half after E.K.R.’s death. According to his wife, S.C.R. and his children do not argue or fight. She testified, “They get along really well unless one of the children speaks with somebody on the other side, and then it is like the flip of the light switch and [the older child] is like a different person.” S.C.R.’s sister testified that the older child appeared to get along well with members of S.C.R.’s family. S.C.R.’s sister and mother testified that neither had ever heard S.C.R. curse or threaten his children, and neither had observed him physically disciplining them.
¶ 12. S.C.R., then thirty-seven years old, testified briefly. S.C.R. stated he wanted custody of his children so that he might raise them, show them love, and care for them. He admitted experiencing some difficulty with the older child. According to S.C.R., “[The older child] gets a bad attitude and then it changes. It is like turning on the flip of a switch. If everything goes her way, it’s good. If she doesn’t get what she wants, then she starts showing out.” At no point in his testimony did S.C.R. deny the older child’s allegations of abuse.
¶ 13. The experts’ evaluations of the parties, the children, and recurring allegations of abuse involving the younger child are extensive and are contained in both oral testimony and written documents. S.C.R.’s expert, Dr. Donald Matherne, a licensed clinical psychologist, first saw S.C.R. for an evaluation of whether he was sufficiently disabled for Social Security Disability Income payments. Dr. Math-erne noted S.C.R. functions within the low average range of intelligence. He explained that while S.C.R. is not retarded, his low intellectual functioning could be the result of anything from accidental head trauma to a preexisting level of function. Dr. Matherne opined that S.C.R. would continue to function at a low intellectual level.
¶ 14. Some time later Dr. Matherne again met with S.C.R., this time to assess whether S.C.R. was suitable to have visitation with his children during the pendency of the divorce proceedings. According to Dr. Matherne, personality testing indicated S.C.R. is self-assured, confident and dominant, and prefers to interact with others in situations in which he can exercise some degree of control. Dr. Matherne also found S.C.R.’s score on the aggression scale to be in the higher level of the normal range indicating that he may be seen by others as impatient and easily irritated. Dr. Matherne noted S.C.R. had reported that E.K.R. had filed a simple assault charge against him for slapping her and S.C.R. admitted slapping her.
*697 ¶ 15. Two court-appointed experts met with the parties and the children and then reported to the court. John Galloway, Ph. D., has a master’s degree in social work and a doctorate in sociology. He is licensed in Louisiana as a social worker, performing psychotherapy and counseling. William Wiedorn, M.D., is a medical doctor, board certified in psychiatry.
¶ 16. The experts’ first report describes the older child as cooperative and outgoing. Before being asked, the older child volunteered that she did not wish to visit with her father because he hurt her mother and she was afraid he would hurt her, too. The older child stated emphatically that she would prefer to live with her maternal grandparents. The report noted that the grief the older child felt as a consequence of her mother’s death was accentuated by prior family discord and acknowledged drug and alcohol abuse.
¶ 17. The younger child was also described as outgoing. According to the report, he did not seem to be aware of the fact that his mother was dead. The younger child had no knowledge of his father and referred to his maternal grandfather as his father.
¶ 18. According to the report, F.W.K. recalled frequently being asked to step in and settle marital disputes between his daughter and S.C.R. According to F.W.K., his daughter frequently complained of being abused, and on more than one occasion he had seen the results of that abuse. L.S.K. stated that E.K.R. had separated from S.C.R. because of physical violence, drug abuse, and adultery.
¶ 19. S.C.R.’s personal presentation during the initial interview was described as arrogant and egotistical. The report states that S.C.R. projected the problems of his marriage onto E.K.R., claiming she could not break away from her parents to devote her attention to him.
¶ 20. The next report submitted by Doctors Galloway and Wiedorn is dated November 1993. According to the report, the older child remained adamant that she did not wish to visit with S.C.R. The report states that she had vivid memories of her father mistreating her mother. The older child became tearful when talking about her mother’s death and expressed appreciation for her grandmother taking her to various school activities in which she was involved. The younger child was not able to talk much about his feelings but said that he enjoyed doing things with his father.
¶ 21. In the second report, Dr. Galloway stated that while the children are aware of the tension between their father and grandparents, he was unsure about the source of tension. He did note that F.W.K. and L.S.K. were less negative about S.C.R. than S.C.R. was about them.
¶ 22. Dr. Galloway stated that since meeting S.C.R., he had been uncomfortable with his arrogant, egotistical behavior and condescending approach to dealing with people. Dr. Galloway reported that he confronted S.C.R. about this and S.C.R. responded by speaking more openly, relating how important it is to him to be a good father. Dr. Galloway opined that S.C.R. trusts very few people and that the defenses he throws up are an attempt on his part to keep people from getting to know him. Dr. Galloway also noted that S.C.R. seems like a person who has had difficulty with impulse control.
¶ 23. Dr. Galloway concluded that F.W.K. and L.S.K. are proven parents who are doing a more than an adequate job of taking care of the children. He also concluded that S.C.R. is an evolving parent who is trying to change his life and have some relationship with his children.
¶ 24. On December 15, 1993, the trial court requested that the Department of Human Services of Forrest County (DHS) evaluate the homes of both the father and the grandparents. DHS, in a report filed on May 2, 1994, recommended that the children remain in the home of F.W.K. and L.S.K. DHS concluded that the younger *698 child’s allegations of abuse at the hands of the maternal uncle could not be substantiated. The parties eventually agreed there was no evidence of any sexual molestation.
¶ 25. In the first report filed in 1995, Dr. Galloway stated that problems continued concerning S.C.R.’s immaturity and L.S.K’s opinion that S.C.R. would hurt the children. He also stated neither F.W.K. or L.S.K. wanted to keep S.C.R. from the children, but both were concerned by his prior behavior and what they perceived as recent erratic behavior.
¶ 26. On April 7, 1995, Dr. Matherne reported to S.C.R.’s lawyer that when he first saw S.C.R., S.C.R. had “some apparent anger issues” but he has demonstrated significant growth since that time. Dr. Matherne also stated the older child, who initially was rather angry and resentful of her father, seemed to have developed a more positive relationship with her father. Dr. Matherne described the younger child as showing evidence of overactivity. Dr. Matherne expressed concern that F.W.K. and L.S.K. do not adequately discipline the younger child. According to Dr. Math-erne, the younger child perceived his father as being punitive because he is more of a disciplinarian. In his letter dated April 7, 1995, Dr. Matherne recommended that the children be placed with S.C.R. and granted visitation with F.W.K. and L.S.K. Later, however, Dr. Matherne concluded that the older child should remain with F.W.K. and L.S.K. and that the younger child should be placed with S.C.R.
¶ 27. In 1995, allegations of sexual molestation by the children’s maternal uncle emanated from the younger child. Doctors Galloway, Wiedorn and Matherne all met with the younger child concerning these allegations. Doctors Galloway and Wiedorn reported that the younger child could not recall any incidents when his maternal uncle abused him until his sister “helped” him recall the incidents. The younger child did not appear anxious or depressed, nor did he show any appropriate shyness or anger at what allegedly took place. Doctors Galloway and Wie-dorn concluded that the younger child was only reporting what he had been told to say. According to them, this was “absolutely not the clinical picture of a child who had been sexually abused.”
¶ 28. Dr. Matherne reported directly to the court on August 1, 1995. According to Dr. Matherne, the younger child denied that his older sister instructed him to allege the abuse. Dr. Matherne also stated that the older child denied instructing her younger brother to make these allegations.
¶29. In a report dated March 26, 1996, Doctors Galloway and Wiedorn stated that when they began working with this case, everyone involved was working toward reuniting S.C.R. with his children. The report recounted that after the first allegations of abuse were reported, the parties agreed that there was no evidence of any sexual molestation. Later, more allegations of sexual molestation emanated from what was alleged to be the younger child’s conversations with his father and with Dr. Matherne. Doctors Galloway and Wie-dorn concluded that these allegations were “indicative of the type of kind of immature, inappropriate and impulsive behavior of [S.C.R.].” At this time, Doctors Galloway and Wiedorn recommended more structured visitation between S.C.R. and the children and stated that as time progressed it became doubtful that granting S.C.R. custody would be in the best interest of the children.
¶30. At trial, Dr. Matherne testified that in his expert opinion there was no evidence to suggest that S.C.R. should be prevented from acting as a parent to his children. However, Dr. Matherne acknowledged that there would be ongoing problems if the older child were placed in S.C.R.’s custody. At this time, Dr. Math-erne recommended split custody, the older child remaining with F.W.K. and L.S.K. and the younger child being placed with S.C.R..
*699 ¶ 31. Dr. Galloway testified that while some of the older child’s anger toward her father had diminished, it was his opinion that the older child should remain in the custody of F.W.K. and L.S.K., with whom she has formed a close relationship. Dr. Galloway concluded that the younger child should also remain in the custody of F.W.K. and L.S.K. Dr. Galloway further recommended that the children have supervised visitation with S.C.R. Dr. Galloway explained that S.C.R. had been argumentative throughout the course of these proceedings and has continued to make accusations that “keep things stirred up.”
¶ 32. Dr. Wiedorn also recommended that both children be placed in the custody of the grandparents and have supervised visitation with their father. According to Dr. Wiedorn, the older child’s feelings of anger toward her father had been consistent and sincere. However, Dr. Wiedorn opined that the younger child had been “programmed” to make the allegations of sexual abuse.
Testimony — Second Hearing
¶ 33. Dr. Michael West, a general dentist and the coroner for Forrest County, testified that S.C.R. brought his son to see him on June 10, 1996. According to Dr. West, the child claimed he had been the victim of sexual abuse involving fondling and oral sex. Dr. West noted that S.C.R. was present during his meeting with the child. Dr. West, who claimed no expertise in sexual abuse, referred S.C.R. to the district attorney’s office.
¶ 34. Berdia Jordan, a social worker aide employed by DHS met with the child on June 26, 1996, at S.C.R.’s request. According to Jordan, the child made no allegations regarding oral sex but made other allegations of sexual abuse. Jordan noted that S.C.R. was present during her interview with the child.
¶35. Lillie Crawford, a social worker employed by DHS, also interviewed the child and the parties in August 1996. Outside the presence of the parties, the child stated that he made the allegations of sexual abuse because his father told him to and he was afraid of his father. The child related that his father had threatened to “make his bottom look like a zebra” if he failed to tell others that his maternal uncle was “messing” with him. The child insisted that his maternal uncle never abused him. Crawford concluded that the allegations of sexual abuse could not be substantiated. On cross examination, Crawford did admit that Jordan’s report stated that the child told Jordan that it was his grandparents who threatened to “make him look like a zebra” if he told on his maternal uncle.
¶ 36. Dr. Pamela Cutrer, a clinical psychologist, examined the child on February 20 and March 4, 1997. The child, then seven and half years old, adamantly denied any abuse by his maternal uncle. In Dr. Cutrer’s report, she stated that she began the interview by asking the child if he knew why they were meeting and the child responded, “About that lie my daddy told me to tell? Is that it?” Also, the child stated that S.C.R. was mean and frequently hit him in the face. According to the child, S.C.R. could be nice when other people were around, but when they were left alone, S.C.R. could be mean. Dr. Cut-rer opined that the child was being truthful during the interview.
¶ 37. Dr. Matherne remarked that the younger child had become more ambivalent toward his father since prior interviews conducted with the child in July 1996 and August 1997.
¶ 38. The final witness, John Kerschb-aum, a licensed clinical social worker with a degree in clinical social work, testified that he first met with the younger child at E.KR.’s request because of some problems he was having at school. Kerschb-aum stated that he had seen the child approximately thirty-five times since January of 1993. According to Kerschbaum, the child is afraid of his father. Kerschb-aum opined that the child lied about the *700 claims of sexual abuse but was telling the truth now.
¶ 39. The trial court found the evidence to be clear and persuasive that S.C.R. was morally unfit for custody as indicated by his willingness to instruct and compel one of the minor children to make false allegations of abuse against his maternal uncle, and the court concluded that S.C.R. was unfit for custody where the maternal grandparents were able and willing guardians. S.C.R. appeals to this Court from the trial court’s judgment awarding custody of the children to F.W.K. and L.S.K.

STATEMENT OF THE LAW

1.

WHETHER THE TRIAL COURT ERRED IN GRANTING CUSTODY OF THE MINOR CHILDREN TO THE MATERNAL GRANDPARENTS INSTEAD OF THE NATURAL FATHER
¶ 40. We will uphold the chancellor’s findings unless they are manifestly wrong or unsupported by substantial credible evidence. Sellers v. Sellers, 638 So.2d 481, 483 (Miss.1994). According to S.C.R., the trial court- committed manifest error in finding S.C.R. unfit to be awarded custody of his two minor children.
¶41. Because the trial court disposed of the issue of the termination of parental rights in S.C.R.’s favor at' the conclusion of the first trial, the case remaining is essentially a contest for custody between the maternal grandparents and the natural father. The settled law of this state governing such situations is succinctly stated in Rutland v. Pridgen, 493 So.2d 952, 954 (Miss.1986):
The general rule is: It is presumed that the best interest of a child will be preserved by his or her remaining with the surviving parent. In order to overcome this presumption there must be a clear showing that the parent has (1) abandoned the child, or (2) the conduct of the parent is so immoral to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have custody,
(citations omitted).
¶ 42. In its' Memorandum Opinion, the trial court found that the lay testimony offered in the first trial was marked with the usual contradictions expected in a custody contest. The court also noted the recommendations made by the testifying experts regarding custody: by court-appointed Doctors Galloway and Wiedorn that custody of both children be continued in F.W.K. and L.S.K. for some further period of time and by S.C.R.’s expert Dr. Matherne that consideration be given to “split” custody (i.e., the older child remain with F.W.K. and L.S.K. and the younger child be placed with S.C.R.). The court further .stated that the evidence presented in the second trial, when combined with that presented in the first trial, amounted to a clear and persuasive showing that S.C.R. had demonstrated his unfitness to be awarded custody of his two minor children. With respect to the second trial, the court noted there was unanimity from the DHS professionals that the younger child’s charge of sexual abuse was not substantiated, having been generated by S.C.R. and alleged by the younger child at the behest of S.C.R. The court also noted that Doctors Galloway, Wiedorn, and Cutrer also concluded that the allegations of abuse were false and were the product of S.C.R. instructing the younger child to lie.
¶ 43. Based on this evidence, the court made a specific finding that S.C.R.’s willingness to compel his son to report a false charge of sexual abuse against his maternal uncle demonstrates a profound lack of respect for honesty, truth, and rectitude of conduct. The trial court determined that S.C.R.’s actions evidenced a lack of concern for proper training and rearing of his child and a propensity to resort to the use of untruth to gain his desire, all without regard for the impact upon his children or upon those who are falsely accused. The court found that S.C.R’s conduct was so *701 immoral as to be detrimental to his children. After carefully reviewing all of the evidence presented, we conclude that substantial credible evidence exists in the record to support the trial court’s finding that the rebuttable presumption that the children’s best interest is served by placing custody in a surviving natural parent was successfully overcome by clear and convincing evidence that S.C.R. intentionally instructed his minor son to make false allegations of sexual molestation against the child’s maternal uncle.
II.
WHETHER THE TRIAL COURT ERRED IN REOPENING THE RECORD AFTER TAKING THE CASE UNDER ADVISEMENT FOR FINAL DECISION ' SEVEN MONTHS EARLIER
III.
WHETHER THE TRIAL COURT ERRED IN NOT RENDERING A DECISION UPON THE PARTIES’ RESPECTIVE PETITIONS FOR CUSTODY OF THE MINOR CHILDREN FOR MORE THAN FOUR AND ONE HALF YEARS FOLLOWING THE COMMENCEMENT OF SUCH LITIGATION
¶44. S.C.R. complains the trial court took its ruling under advisement at the conclusion of the first trial held April 2 and 3, 1996, and that in excess of seven months later, despite his objection, the trial court rendered its order on the Motion to Reopen Record on November 9, 1996. According to S.C.R., when the trial court did not render its decision upon either F.W.K. and L.S.K’s original petition or S.C.R.’s original cross-petition for relief within forty five days after the expiration of six months following April 3, 1996, the parties’ respective petition and cross-petition should have been dismissed without prejudice pursuant to M.R.A.P. 15. S.C.R. further submits that the practical effect of the court’s- delay in not hearing the instant case for almost three years and then further delaying its judgment for another one and half years produced a result with respect to the minor children that is “inconsistent with substantial justice and is in effect a miscarriage of justice.”
¶45. We stated in Kelly v. Shoemake, 460 So.2d 811, 815-16 (Miss.1984):
It is well settled that a chancery court has the authority to reopen a case for additional proof.
[[Image here]]
[I]t has long been the settled rule in our courts of equity that where on a final hearing or even after submission it is clearly perceived that some material point is either left unproved or the explanation of it is insufficient, the chancellor has the discretion in the interest of justice and merits to remand it to the docket for further proof.
[[Image here]]
The right of a litigant to have a case reopened for additional testimony must necessarily be left largely to the sound judicial discretion of the chancellor.... The chancellor’s decision should reflect a proper balance between administering full justice in an individual case and maintaining a prompt, efficient and orderly administration of justice, free from inexcusable negligence by the parties.
(citations omitted) (emphasis added).
¶ 46. In this case an early trial oh the merits was not possible because of the evaluations ordered by the court and the evaluations that were being procured by S.C.R. from private sources. The record reflects that the case was set for trial several times, but continuances were granted for various reasons or circumstances, some by agreement, some over objection, and some by the court without concurrence of either party. The record also reflects various objections by the parties, a motion for recusal and a motion for an interlocutory appeal. In April 1996, a trial was finally held. Then, in the latter *702 part of June, when the court was reviewing the evidence presented in the April trial, the court received from DHS a report of new allegations of sexual abuse involving the younger child. As a consequence of this report and communication with the guardian ad litem and with the attorneys of record, the trial court determined a second evidentiary hearing would be necessary before final judgment could be rendered.
¶47. M.R.A.P. 15 provides, in pertinent part, that:
If a trial judge in a civil case fails to render a decision on a motion or request for relief which would be dispositive of all the claims or the rights and liabilities of all the parties within six (6) months after taking such a motion or request under advisement, any party in the case may apply to the Supreme Court for a writ of mandamus to compel the trial judge to render a decision on the matter taken under advisement or deferred.
If a party who filed the original complaint fails to apply for a writ of mandamus within the time prescribed, the complaint shall stand dismissed without prejudice, except upon a showing that the failure to timely apply resulted from excusable neglect and that manifest injustice will result from the dismissal. If a party who has filed a counter-claim or a cross-claim fails to apply for a writ of mandamus within the time prescribed, likewise, except upon a showing that the failure to timely apply resulted from excusable neglect and that manifest injustice will result from the dismissal, the counter or cross-claim shall stand dismissed without prejudice.
M.R.A.P. 15 is only applicable in those instances where the trial court has neglected to enter a judgment from which a party would have a right to appeal to this Court in due course. Crocker v. Commercial Nat’l Bank & Trust Co., 455 So.2d 1309, 1311 (Miss.1984). That is to say, the rule only applies when a motion or request for relief is made which would be dispositive of all claims or the rights and liabilities of all parties. The purpose of Rule 15 is “to assure that a trial court will promptly render judgment in a case and thus terminate the litigation or trigger the appellate process. The function of the rule is reduction of delay, increase of judicial efficiency and economy and procedural safeguards for litigants.” Crocker, 455 So.2d at 1311.
¶ 48. According to the Comment, Rule 15 applies at the conclusion of a trial without a jury when the court takes the case under advisement. The trial court took the instant case under advisement at the conclusion of the first trial held April 2 and 3, 1996. Pursuant to Rule 15, the trial court had until October 4,1996, six months from the time it took the case under advisement, to render a timely decision. The Rule also provides an additional forty five days following the six months period, establishing a deadline of November 18, 1996, for either party to apply to this Court for a writ of mandamus to compel the trial judge to render a decision on the matter taken under advisement.
¶ 49. F.W.K. and L.S.K. filed their Motion to Reopen Record of the instant proceedings on September 17, 1996. The trial court sustained the Motion to Reopen Record by order dated November 9, 1996. By reopening the evidence on November 9, 1996, the trial court, in effect, stopped the running of the clock as described in Rule 15 because the case was no longer under advisement. Hence, Rule 15 was no longer applicable here until the case was again taken under advisement following the second evidentiary hearing held in August 1997.
¶ 50. The trial court rendered its opinion in the instant case on October 14, 1997. While the protracted nature of these proceedings is regrettable, we find that given the facts of this case the chancellor’s decision to reopen the record and his decision to conduct a second evidentiary hearing does not constitute an abuse of discretion.
*703 IV.
WHETHER THE COURT ERRED IN AWARDING JUDGMENT AGAINST S.C.R., REQUIRING HIM TO PAY ONE HALF OF THE REMAINING UNPAID BALANCE DUE UNTO THE EXPERT WITNESSES
V.
WHETHER THE TRIAL COURT ERRED IN AWARDING JUDGMENT AGAINST S.C.R., REQUIRING HIM TO PAY ALL OF THE FEES AND EXPENSES OF THE GUARDIAN AD LITEM
¶ 51. S.C.R. asserts that the trial court abused its discretion in assessing against him one half of the remaining costs of the court’s expert witnesses, Doctors Galloway and Wiedorn, and all of the fees and expenses of the guardian ad litem, Byron J. Stockstill. S.C.R. concedes that the court has authority to assess costs in the instant proceedings. However, he maintains that Doctors Galloway and Wie-dorn, initially appointed as experts of the court, essentially became expert witnesses for F.W.K. and L.S.K. Further, S.C.R. argues that he should be required to pay no more than one half of Stockstill’s fees and expenses, because F.W.K. and L.S.K. caused or requested the majority of the guardian ad litem’s services. S.C.R. cites no legal authority in support of these arguments.
¶ 52. M.R.C.P. 54(d) provides for an award of costs to the prevailing party “unless the court otherwise directs.” The chancellor taxed S.C.R., the non-prevailing party, with certain costs related to the instant proceedings. Finding no legal authority or facts in the record which demonstrate an abuse of discretion on the part of the chancellor in assessing these fees, we affirm the judgment of the trial court in all respects.
¶ 53. AFFIRMED.
PRATHER, C.J., PITTMAN, P.J., BANKS, SMITH, MILLS, WALLER AND COBB, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.