ISHEE, J.,
for the Court.
¶ 1. A.Y. appeals the decision of the Forrest County Youth Court terminating her parental rights to her minor child, C.B.Y. The Forrest County Department of Human Services (DHS) filed a petition to terminate the parental rights of A.Y., R.H., and an unknown putative father on June 2, 2004. A trial was held, and on January 10, 2005, the youth court entered a judgment terminating A.Y.’s parental rights. Aggrieved by the youth court’s decision, A.Y. appeals. She presents the following issues for our review:
I. Whether the youth court judge erred in finding that proof met the clear and convincing burden necessary to terminate the parental rights of A.Y.
II. Whether the DHS failed to implement a plan for reunification under Mississippi Code Annotated section 93-15-103, as amended, for which parental rights can be terminated.
III. Whether a minor under the legal custody of the DHS can be sued by the same agency to terminate parental rights to her child.
IV. Whether the youth court should have emancipated A.Y. upon her eighteenth birthday or at the time of her marriage to her husband.
V. Whether the rights of A.Y. were violated when her attorney failed to get notice of the review hearing leading up to the termination of parental rights.
VI. Whether the DHS violated the constitutional rights of A.Y. by requiring that she and her newborn leave her husband and submit to foster care before they would implement a plan for reunification with C.B.Y.
FACTS
¶2. A.Y., who was born on June 26, 1984, was fifteen years of age when she gave birth to a boy, C.B.Y., on November 3, 1999. In 2001, W.Y., C.B.Y.’s maternal grandmother, reported to the DHS that A.Y. had, taken C.B.Y. and run away. W.Y. further reported that C.B.Y. had asthma and A.Y. was not taking proper care of him. A.Y. responded that she ran away because her mother was on drugs. As a result of the allegations, A.Y. and C.B.Y. came into the temporary custody of the DHS on July 31, 2001. On September 18, 2001, the youth court found A.Y. and C.B.Y. to be neglected/dependent children, pursuant to Mississippi Code Annotated section 43-21-105(£), (p) (Supp.2005). The youth court ordered legal custody of C.B.Y. to be maintained by the DHS, with physical placement in the foster home of Stephen and Joanne High. The youth court further ordered a permanency plan of reunification and a concurrent plan of relative placement for C.B.Y. Regarding A.Y., the youth court ordered that she enter into a service agreement with the DHS.
¶ 3. On June 25, 2002, the youth court conducted a six-month review. The youth court determined that legal custody of C.B.Y. should remain with the DHS and that C.B.Y.’s physical placement should be in the home of his great-aunt, Virginia Byrd. The court also maintained that the permanency plan for C.B.Y. was one of reunification.
¶ 4. On July 15, 2002, A.Y. took C.B.Y. and ran away from her foster home. She married Jason Brett Anderson on July 28, 2002. A.Y. testified that Ramona Lockett, an employee with the DHS, advised her to run away once she turned eighteen years of age, to get married, and to stay hidden. On July 22, 2002, the youth court ordered that any law enforcement officer, where- *977 so-ever located, should take custody of C.B.Y. and return him to the custody of the DHS. On September 7, 2002, the youth court issued an order finding that A.Y. was on runaway status and ordering that the review of C.B.Y.’s welfare be continued until he could be found and returned to the custody of the DHS.
¶ 5. On November 21, 2002, A.Y. gave birth to a second son, A.B.A. A.Y. lived with Anderson, C.B.Y., and A.B.A. until June 3, 2003, when C.B.Y. developed a staph infection and was hospitalized at Forrest General Hospital in Hattiesburg, Mississippi. According to the testimony of Deborah Stewart, a social worker with the DHS, W.Y. contacted the DHS, revealed CJB.Y.’s location, and stated her opinion that A.Y. was not taking care of C.B.Y. On July 1, 2003, the DHS regained physical custody of C.B.Y. On August 27, 2003, C.B.Y. was placed in the foster home of Bobby and Lucretia Zina Scarbrough.
¶ 6. A.Y. appeared at a review hearing that was held on August 19, 2003. The youth court ordered that the permanency plan for C.B.Y. be changed from reunification to termination of parental rights and adoption. On November 21, 2003, Robert Marshall agreed to represent A.Y. pro bono. He testified that he contacted Jean Fertitta, the co-head of the DHS, on December 15, 2003 and that they discussed A.Y.’s case.
¶ 7. On December 20, 2003, A.Y. and Anderson met with Fertitta and signed authorizations for a background check. According to Fertitta’s testimony, the background check revealed that A.Y. and Anderson both had a criminal background, and that Anderson had “an extensive arrest record.” On February 10, 2004, the youth court conducted another review hearing. Because Marshall did not file his entry of appearance with the youth court, he did not receive notice of the hearing. Stewart, the social worker, testified that, in an effort to locate A.Y. prior to the review hearing, the DHS traveled to the address provided by the Petal Police Department, but found that no one was living at that address. Marshall filed a motion for reconsideration, which was denied by the youth court.
¶ 8. On May 13, 2004, the youth court appointed James D. Johnson to be the guardian ad litem for C.B.Y. On June 2, 2004, the DHS filed a petition to terminate the parental rights of A.Y., R.H. (the alleged natural father of C.B.Y), and an unknown putative father. A trial was held on October 26, 2004.
¶ 9. During the trial, A.Y. testified that while she and C.B.Y. were supposed to be living with the Highs, she was actually living in an apartment with Anderson. A.Y. admitted that she knowingly and fraudulently gave the DHS misinformation about her living arrangements when a DHS agent would visit the High’s residence. She further testified that the last time she saw C.B.Y. was two days before the DHS took him from the hospital. A.Y. also admitted that she avoided contact with the DHS because she did not want the DHS to dictate where she was going to stay, and that as a result, she did not have any contact with C.B.Y.
¶ 10. Mrs. Scarbrough testified that the DHS contacted her on September 3, 2004 to schedule a visit between A.Y. and C.B.Y. She further testified that when she informed C.B.Y. about the proposed visit, he “started shaking his head really hard and crying, No, no, no, Mama, no.” According to Mrs. Scarbrough, C.B.Y. jumped into her lap and began crying so hard that he could barely breathe.
¶ 11. Stewart testified that June of 2003 was the last time A.Y. saw C.B.Y., but that A.Y. contacted her by phone on December *978 31, 2003 and January 5, 2004. Stewart further testified that the first time A.Y. called she wanted to know what she could do to get a visit with C.B.Y. Stewart explained to A.Y. that she was still in custody of the DHS, and that she (Stewart) was coming to pick her up at her home. Stewart went to A.Y.’s home, but A.Y. did not open the door. Stewart testified that the second time A.Y. called, she asked about visiting C.B.Y., but hung up the phone when Stewart told her that she needed to come to the office because she was still in custody.
¶ 12. On January 10, 2005, the youth court entered a judgment terminating A.Y.’s parental rights. At the time of the judgment, C.B.Y. was four years and eleven months old. The youth court found that the statutory grounds for termination of parental rights had been satisfied, pursuant to Mississippi Code Annotated section 93-15-103(3) (Rev.2004). Specifically, the youth court determined the following: (1) the DHS was unable to return C.B.Y. to A.Y. because she' secreted herself from the DHS and from youth court jurisdiction; (2) A.Y. failed to assume proper parental responsibility and exhibited ongoing behavior by running away and making choices adverse to C.B.Y.’s best interest; and (3) A.Y.’s behavior had caused a substantial erosion of the parent/child relationship, evidenced by an extreme aversion by the child toward his mother.
STANDARD OF REVIEW
¶ 13. In order to establish a case for termination of parental rights, the burden of proof is clear and convincing evidence. See Miss.Code Ann. § 93-15-109 (Rev.2004). On appeal, however, the standard of review in termination of parental rights cases is limited. D.J.L. v. Bolivar County Dep’t. of Human Services ex rel. McDaniel, 824 So.2d 617, 620(¶ 10) (Miss.2002) (citing S.N.C. v. J.R.D., 755 So.2d 1077, 1080(¶ 7) (Miss.2000)). This Court gives deference to the family court’s findings of fact; we will uphold the family court’s decision unless we determine that it is not supported by substantial, credible evidence. G.Q.A. v. Harrison County Dep’t. of Human Resources, 771 So.2d 331, 335(¶ 14) (Miss.2000) (citing S.C.R. v. F.W.K., 748 So.2d 693, 700(¶ 40) (Miss. 1999)). We must determine “not how we would have decided the case ab initio but whether there would be credible proof from which a rational trier of fact may have found,” as the court did in this case. D.J.L., 824 So.2d at 620(¶ 10) (citing Ethredge v. Yawn, 605 So.2d 761, 764 (Miss. 1992)).
ISSUES AND ANALYSIS
I. Whether the youth court judge erred in finding that proof met the clear and convincing burden necessary to terminate the parental rights of A.Y.
¶ 14. A.Y. argues that the facts in this case cannot meet the first hurdle in the statute governing the termination of parental rights. The first hurdle to which A.Y. refers is found in Mississippi Code Annotated section 93-15-103(1) (Rev.2004), which provides in part:
When a child has been removed from the home of its natural parents and cannot be returned ... within a reasonable length of time because returning to the home would be damaging to the child or the parent is unable or unwilling to care for the child, relatives are not appropriate or are unavailable, and when adoption is in the best interest of the child, taking into account whether the adoption is needed to secure a stable placement for the child and the strength of the child’s bonds to his natural parents and the effect of future contacts between them, the ground listed in the subsections (2) and (3) of this section shall be *979 considered as grounds for the termination of parental rights. The grounds may apply singly or in combination in any given case.
¶ 15. A.Y. concedes that C.B.Y. was removed from the home, but notes that she was also removed. A.Y. asserts that C.B.Y. was taken from the hospital because she was considered a runaway, not because of any unwillingness or inability on her part to care for C.B.Y. She further insists that the facts do not support the conclusion that C.B.Y. could not be returned to her within a reasonable amount of time. A.Y. notes that it was only seven weeks after C.B.Y. was removed from her physical custody that a review hearing was held which resulted in a permanency plan for termination of parental rights and adoption.
¶ 16. In the final judgment terminating parental rights, the youth court determined that C.B.Y. was removed from A.Y.’s physical custody because A.Y., who was also in legal custody of the DHS, ran away. The court reasoned that, because of A.Y.’s runaway status, C.B.Y. could not be returned to her within a reasonable amount of time. The court further determined that it would not be in C.B.Y.’s best interest to return him to A.Y. because she was unable to care for him, and relative placement was inappropriate. Regarding the child’s best interest, the youth court determined that C.B.Y. had been under the jurisdiction of the youth court since July of 2001; thus, he had been in foster care for nearly seventy-percent of his life. The youth court further determined that C.B.Y. had been in a safe, secure, and stable home environment and had been a candidate for prospective adoption since August 27, 2003. Consequently, the court concluded that termination of parental rights and adoption were needed to provide a safe, secure, and stable permanency placement for C.B.Y.
¶ 17. We find substantial credible evidence to support the youth court’s findings regarding this “first hurdle” of the statutory requirements. A.Y. took C.B.Y. and ran away from her foster home on July 15, 2002. On September 7, 2002, the youth court determined that A.Y. was on runaway status and ordered that the review of C.B.Y.’s welfare be continued until he could be found and returned to the custody of the DHS. A.Y. testified that while she and C.B.Y. were supposed to be living with the Highs, she was actually living in an apartment with Anderson. A.Y. testified that the last time she saw C.B.Y. was two days before the DHS took him from the hospital. She also admitted that she avoided contact with the DHS because she did not want the DHS to dictate where she was going to stay, and that as a result, she did not have any contact with C.B.Y. Consequently, we find that A.Y.’s testimony alone is sufficient evidence to support the youth court’s finding that her behavior, i.e., choosing to remain on runaway status to avoid the DHS, is the reason that C.B.Y. could not be returned to her within a reasonable amount of time.
¶ 18. Regarding the specific statutory grounds for termination of parental rights, A.Y. also argues that the youth court’s findings are unfounded. Pursuant to Mississippi Code Annotated section 93-15-103(3), the youth court found the following by clear and convincing evidence: (1) the DHS was unable to return C.B.Y. to A.Y. because she chose not to satisfy the plan for reunification by secreting herself from the DHS and from youth court jurisdiction; (2) A.Y. failed to assume proper parental responsibility and exhibited ongoing behavior by running away and making choices adverse to C.B.Y.’s best interest; and (3) A.Y.’s behavior had caused a substantial erosion of the parent/child relationship, evidenced by an extreme aversion by the child toward his mother.
*980 ¶ 19. Mississippi Code Annotated section 93 — 15—103(3)(d)—(f) (Rev.2004) provides in part the following:
(d) When the child has been in the care and custody of a licensed child caring agency or [DHS] for at least one (1) year, that agency or the department has made diligent efforts to develop and implement a plan for return of the child to its parents, and:
(i) The parent has failed to exercise reasonable available visitation with the child; or
(ii) The parent, having agreed to a plan to effect placement of the child with the parent, fails to implement the plan so that the child caring agency is unable to return the child to said parent; or
(e) The parent exhibits ongoing behavior which would make it impossible to return the child to the parent’s care and custody:
[[Image here]]
(ii) Because the parent fails to eliminate behavior, identified by the child caring agency or the court, which prevents placement of said child with the parent in spite of diligent efforts of the child caring agency to assist the parent; or
(f) When there is an extreme and deep-seated antipathy by the child toward the parent or when there is some other substantial erosion of the relationship between the parent and child which was caused at least in part by the parent’s serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate.
¶20. We find that the findings of the youth court met the statutory grounds for termination of parental rights and that the findings are supported by substantial credible evidence. First, we note that the record shows that C.B.Y. was in the custody of the DHS since July 31, 2001, which is well over the statutory requirement of one year. We further note that, pursuant to Mississippi Code Annotated section 93-15-103(1), involuntary termination of parental rights may be based on one or more of the enumerated factors.
¶ 21. The youth court specifically found that A.Y.’s ongoing behavior was a ground for termination of her parental rights. The ongoing behavior cited by the youth court was • A.Y.’s decision to remain on runaway status, thus preventing her from maintaining a bond with C.B.Y., as it was impossible to return C.B.Y. to her custody and care when she chose to avoid the DHS. The record supports the trial court’s finding of ongoing behavior. At the time of the trial on October 26, 2004, A.Y. had not seen C.B.Y. since she last visited him in the hospital in June of 2003; she testified that she had no contact with C.B.Y. because she chose to avoid the DHS.
¶ 22. The youth court found an additional ground for terminating A.Y.’s parental rights, namely, the substantial erosion of the parent/child relationship. Mrs. Scarbrough testified that C.B.Y. jumped into her lap and cried until he hyperventilated when she told him that A.Y. wanted to visit with him. Furthermore, Rebecca Hartfield, the DHS adoption specialist assigned to C.B.Y.’s case, testified that the Scarbroughs and C.B.Y. had a parentyehild relationship. Consequently, we find substantial credible evidence to support the youth court’s findings. This issue is without merit.
II. Whether the DHS failed to implement a plan for reunification under Mississippi Code Annotated section 93-15-103, as amended, for. which parental rights can be terminated.
¶ 23. A.Y. argues that the DHS failed to make a diligent effort to develop and implement a plan for C.B.Y.’s return to her. As previously mentioned, we find *981 substantial credible evidence to support the youth court’s finding that A.Y.’s decision to remain on runaway status prevented the DHS from returning C.B.Y. to A.Y. Furthermore, A.Y. testified that she avoided contact with the DHS, and she admitted that she never made herself available to enter into a service agreement with the DHS. Therefore, this issue is without merit.
III. Whether a minor under the legal custody of the DHS can be sued by the same agency to terminate parental rights to her child.
¶ 24. A.Y. asserts that the DHS created a conflict of interest when it filed suit against her because she was still in the legal custody of the DHS. Citing Mississippi Code Annotated section 43-15-13(3), A.Y. suggests that the DHS breached its duty to “return the child to its natural parent.” We disagree.
¶25. Mississippi Code Annotated section 43-15-13(3) (Rev.2004) states in part that “[t]he goal of the [DHS] shall be to return the child to its natural parent(s) or refer the child to the appropriate court for termination of parental rights.” (emphasis added). Moreover, Mississippi Code Annotated section 93-15-105(1) (Supp.2005) provides in part that “[a]ny person, agency or institution may file for termination of parental rights in the chancery court or the family or county court sitting as the youth court of the county in which a defendant or the child resides.” Thus, the DHS clearly had the authority to file for termination of AY.’s parental rights. Accordingly, this issue is without merit.
IV. Whether the youth court should have emancipated A.Y. upon her eighteenth birthday or at the time of her marriage to her husband.
¶ 26. A.Y. reached the age of eighteen on June 26, 2002 and married on July 28, 2002. She asserts that she should have been considered emancipated at the time of her marriage, pursuant to Mississippi Code Annotated section 93-5-23. A.Y. further contends that she should not have been in the custody of the DHS after her eighteenth birthday, pursuant to Mississippi Code Annotated section 43-27-101 (Rev. 2004), which defines a “[e]hild or youth in the custody of the [DHS]” as a person “[w]ho has not yet reached his eighteenth birthday.”
¶ 27. We find AY.’s argument to be unpersuasive for several reasons. First, Mississippi Code Annotated section 93-5-23 (Rev.2004) concerns the length of time a parent is obligated to pay child support, rather than the emancipation of a minor under the jurisdiction of youth court. Second, as A.Y. concedes, Mississippi Code Annotated section 43-15-13 (Rev.2004), which governs the placement of children in foster care, defines “children” as “persons found within the state who are under the age of twenty-one ... and who were placed in the custody of the [DHS] by the youth court of the appropriate county.” Furthermore, Mississippi Code Annotated section 43-21-151(l)-(2) (Rev.2004) provides for exclusive original jurisdiction to youth court “in all proceedings concerning a delinquent child, a child in need of supervision, an abused child or a dependent child ... until the child’s twentieth birthday, unless sooner terminated by order of the youth court.” In the case at bar, the youth court gained exclusive original jurisdiction of AY’s dealings with DHS on July 31, 2001, when the DHS obtained legal custody of the then seventeen-year-old A.Y. Pursuant to Mississippi Code Annotated section 43-21-151(l)-(2), we find that the youth court retained its jurisdiction over A.Y. until her twentieth birthday on June 26, 2004. Therefore, this issue is without merit.
*982 Y. Whether the rights of A.Y. were violated when her attorney failed to get notice of the review hearing leading up to the termination of parental rights.
¶ 28. Under this assignment of error, A.Y. asserts that the court’s failure to give her or her attorney notice of the hearing held on February 10, 2004 constituted a violation of her substantive and procedural due process rights. In support of her argument, A.Y. cites Harris v. Mississippi Valley State University, 873 So.2d 970, 985(¶ 40) (Miss.2004). The court in Harris explained that, once establishing that a party has an interest entitled to procedural due process protection, procedural due process requires that the party receive notice and an opportunity to be heard. Id. The Harris court further held that if the party receives an oral or written explanation of the charges against her, then the notice requirement has been satisfied. Id.
¶ 29. In the case sub judice, A.Y. had notice that the DHS sought to terminate her parental rights; the February 10, 2004 hearing was not a hearing for the termination of parental rights. A.Y. received notice and was present for the termination of parental rights hearing, which was held on October 26, 2004. Regarding notice for the February 10 hearing, the record shows that the DHS traveled to the address that A.Y. provided to the Petal Police Department, but that no one was living at that address. Furthermore, when discussing during trial whether A.Y.’s attorney received notice of the February 10 hearing, the youth court judge stated: “I just want to make that clear so the record will show that nobody — the Court never had any type of notice that Mr. Marshall was in the case until after the hearing.” Based on these facts, we conclude that the DHS was duly diligent in attempting to find A.Y. to give her notice of the February 10 hearing. We further find that A.Y.’s attorney received no notice of that hearing because he was not her attorney of record. Therefore, this issue is without merit.
VI. Whether the DHS violated the constitutional rights of A.Y. by requiring that she and her newborn leave her husband and submit to foster care before they would implement a plan for reunification with C.B.Y.
¶ 30. A.Y. asserts that by attempting to force her into the foster care system with her newborn, and by threatening to withhold contact with C.B.Y., the DHS subjected her to unconstitutional involuntary servitude in violation of the Mississippi Constitution and the Thirteenth Amendment to the United States Constitution. We disagree. In U.S. v. Kozminski, 487 U.S. 931, 942, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988), the United States Supreme Court held that “in every case in which this Court has found a condition of involuntary servitude, the victim had no available choice but to work or be subject to legal sanction.” Clearly, this case does not involve forced labor. A.Y. chose to avoid contact with the DHS. A.Y. was aware that her behavior prevented her from being with her child, yet she refused to make herself available to begin the process of reunification. Therefore, we find that this issue is without merit.
¶ 31. THE JUDGMENT OF THE YOUTH COURT OF FORREST COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO FORREST COUNTY.
LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, *983 GRIFFIS, BARNES AND ROBERTS, JJ., CONCUR. KING, C.J., CONCURS IN RESULT ONLY.